# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# SOUTHERN DIVISION

| | |
|---|---|
| HANNAH BABY, LLC; FIRST UNITED MANAGEMENT, INC.; YOLO CAPITAL, INC.; MOONPIE, FLP; NATIONAL TRUCK FUNDING, LLC; and AMERICAN TRUCK GROUP, LLC | APPELLANTS/ CROSS-APPELLEES |
| v. | CAUSE NO. 1:19cv160-LG-RHW<br>CAUSE NO. 1:19cv173-LG-RHW |
| CHAFFE SECURITIES, INC. and CHAFFE & ASSOCIATES, INC. | APPELLEES/ CROSS-APPELLANTS |
| IN RE NATIONAL TRUCK FUNDING, LLC, et al. | CHAPTER 11 DEBTORS<br>CASE NO. 17-51243-KMS |

## MEMORANDUM OPINION AND ORDER AFFIRMING THE OPINION AND ORDER OF THE BANKRUPTCY COURT AND DISMISSING APPEALS

**BEFORE THE COURT** are two appeals filed by Hannah Baby, L.L.C., First United Management, Inc., Yolo Capital, Inc., Moonpie, FLP,[1] National Truck Funding, LLC, and American Truck Group, LLC, as well as a cross-appeal filed by Chaffe Securities, Inc., and Chaffe & Associates, Inc. The parties appeal the Bankruptcy Court's March 8, 2019 and March 26, 2019 Orders Granting in Part and Denying in Part First and Final Application of Chaffe Securities, Inc. for Allowance of Fees and Expenses. This Court has jurisdiction to hear an appeal of a

---

[1] Hannah Baby, First United Management, Yolo Capital, and Moonpie are collectively referred to as "the Yolo Group" by the parties.

bankruptcy court order pursuant to 28 U.S.C. § 158. Having considered the parties' briefs, the record of the Bankruptcy Court, and the relevant law, the Court finds that the Bankruptcy Court's March 2019 Orders should be affirmed, and these appeals should be dismissed.

## BACKGROUND

The debtors, National Truck Funding, LLC, and American Truck Group, LLC, sought relief pursuant to Chapter 11 of the Bankruptcy Code on June 25, 2017. A few weeks later, the debtors filed an application with the Bankruptcy Court seeking authority to employ Chaffe & Associates as their restructuring advisor and investment banker pursuant to 11 U.S.C. §§ 327, 328, and 1107. The Bankruptcy Court granted the application, subject to two conditions that are not relevant to these appeals. The Engagement Agreement approved by the Bankruptcy Court provided that Chaffe would receive a monthly fee of $15,000 and a sale fee equal to 3.5 % of the "aggregate consideration" of the sale of the debtors or their assets minus any monthly fees previously paid to Chaffe. The Engagement Agreement defined "aggregate consideration" as

> the total fair market value (determined at the time of the closing of a Sale by the Company and Chaffe in good faith) of all consideration paid or payable to, or received by, directly or indirectly, the Company, its Bankruptcy estate, its creditors and/or the security holders of the Company in connection with a Sale including all (i) cash, securities (equity or otherwise) and other property, (ii) Company indebtedness assumed, satisfied, or paid by a purchase (including without limitation, the amount of any indebtedness, securities or other property "credit bid" in any Sale) and any other indebtedness and obligations, including tax claims that will actually be paid, satisfied, or assumed by a purchase from the Company or the security holders of the Company

and (iii) amounts placed in escrow and deferred, contingent and installment payments.

(R. Doc. No. 11-6, at 28.)

Pursuant to the Bankruptcy Court's approval, Chaffe solicited bids for the purchase of the debtors and/or their assets. Chaffe, the debtors, and other interested parties determined that acceptance of the equity purchase and exit funding offer from CAC Properties, Inc., which is an affiliate of the Yolo Group, was in the best interest of the estate and its creditors. On July 2, 2018, the Bankruptcy Court entered an order confirming the Joint Chapter 11 Amended Plan of Reorganization submitted by the debtors, CAC Properties, and the Official Committee of Unsecured Creditors. This Amended Plan provided for exit funding cash of $3.5 million, payment to unsecured/undersecured creditors of their pro rata share of $2 million, assumption of the debtors' approximately $7 million indebtedness to EvaBank, and repayment of the debtors' DIP loan in the amount of $1,056,874. CAC Properties' acquisition of the debtors' equity closed on July 12, 2018. CAC Properties subsequently assigned its rights to its affiliate, Yolo Group Holdings, LLC.

On July 30, 2018, Chaffe filed an application seeking $859,516.12 in compensation, which consisted of a DIP fee of $75,000 and a sale fee of $949,516.12 minus $165,000 for the monthly fee payments Chaffe had previously received. Chaffe also sought $14,018.68 in expenses. Chaffe based its calculation of the sale fee on a total aggregate consideration of $27,129,032. This calculation of aggregate consideration included: exit funding cash of $3,500,000, payments to the debtors'

secured creditors totaling $12,576,125, two $1,000,000 payments to the debtors' unsecured and undersecured creditors, and assumption of the debtors' $7,008,817 Eva Bank Secured Real Estate claim, assumption of the debtors' customer deposits totaling $1,517,981, and assumption of the debtors' $1,002,881 DIP Loan. These items totaled $27,605,804. Chaffe determined that the net present value of these items was $27,129,032.

The Bankruptcy Court entered an order allowing payment of $341,152, which was the uncontested portion of Chaffe's fee request. The Bankruptcy Court conducted a hearing regarding the remainder of Chaffe's fee request and determined that Chaffe was entitled to an additional $406,406 for services rendered and expenses incurred. All the parties appealed.

## DISCUSSION

"When reviewing a bankruptcy court's decision in a 'core proceeding,' a district court functions as an appellate court and applies the standard of review generally applied in federal [courts of] appeals." *Webb v. Reserve Life Ins. Co.*, 954 F.2d 1102, 1103-04 (5th Cir. 1992). A "core proceeding is one that invokes a substantive right provided by Title 11 [of] the Bankruptcy Code or is a proceeding that by its nature could arise only in the context of a bankruptcy case." *Id.* at n.1 (cleaned up). This matter constitutes a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2). Therefore, the Court must review the Bankruptcy Court's findings of fact for clear error, and its conclusions of law de novo. *See in re Nat'l Gypsum Co.*, 208 F.3d 498, 504 (5th Cir. 2000). Mixed questions of fact and law are reviewed de novo.

*Id.* "Findings of fact are clearly erroneous if we have a definite and firm conviction that a mistake has been made." *In re Dillon*, 138 F. App'x 609, 611 (5th Cir. 2005) (citing *Mabey v. Sw. Elec. Power Co.*, 150 F.3d 503, 513 (5th Cir. 1998)).

## I. PAYMENTS TO UNSECURED AND UNDERSECURED CREDITORS

As explained previously, the Engagement Agreement approved by the Bankruptcy Court provided that Chaffe would receive a sale fee equal to 3.5 % of the "aggregate consideration" of the sale of the debtors or their assets minus any monthly fees previously paid to Chaffe. The appellants argue that the Bankruptcy Court double-counted one of the $1,000,000 payments made to the debtors' unsecured and undersecured creditors, because that payment was paid out of the $3,500,000 exit funding cash that was separately included in "aggregate consideration."

At the hearing held before the Bankruptcy Court, Chaffe's Managing Director, Gladys Fenner Gay LeBreton, testified that $757,778 of the $1,000,000 payment was allocated to CAC properties' affiliate, the Yolo Group, which contributed $757,778 to the reorganized debtors as capital in lieu of receiving payment. (R. Doc. 11-7, at 739.) Therefore, she explained, only $242,222 of the $1,000,000 payment was funded by the exit funding cash and that amount was not included in its calculation of aggregate consideration. (*Id.*) Le Breton's testimony is consistent with Section 5.1 of the Plan, which provided that the sources of capital to fund the Plan included reinvestment of distributions received by the Yolo Group due to its status as an unsecured creditor. (R. Doc. 11-5, at 38-39.) As a result, the

Bankruptcy Court's finding that the $757,778 contributed by the Yolo Group should be included in the calculation of aggregate consideration was not clear error.

## II. DONATED PROPERTY

The second issue raised by the appellants concerns real property that was donated to the estate. The debtors operated their business from facilities located on Canal Road in Gulfport, Mississippi. The debtors leased these facilities from their parent company, American Success Irrevocable Trust (hereafter, "ASIT"). ASIT and one of the debtors, National Truck Funding ("NTF"), obtained over $7 million in loans from EvaBank that were secured by the Canal Road property even though NTF did not have an ownership interest in the property. The debtors' attorney was not aware that NTF was a co-maker on the EvaBank loans until approximately six months after the bankruptcy petition was filed. NTF amended its schedules to reflect this unsecured debt owed to EvaBank. On the same day, ASIT quitclaimed the Canal Road Property to the NTF. Thus, the formerly unsecured debt owed to EvaBank became a secured debt, and the bankruptcy estate was required to pay EvaBank $7 million. The Bankruptcy Court noted, "If the EvaBank debt had remained an unsecured claim, payment on the $7 million debt would have been shared pro rata with other unsecured creditors." (R. Doc. 11-5, at 883.) The appellants asked the Bankruptcy Court to alter Chaffe's fee under the Engagement Agreement, arguing that "[p]aying a sales fee to Chaffe, for an improvident business decision, merely compounds the problem and amounts to a windfall to Chaffe." (*Id.*)

However, the Bankruptcy Court approved Chaffe's Engagement Agreement pursuant to Section 328, which allows a bankruptcy court to alter a professional's fee only if the professional's terms and conditions of employment "prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." *See* 11 U.S.C. § 328(a). The Fifth Circuit has held that the question of whether subsequent developments were "capable of being anticipated" is subject to de novo review. *In re ASARCO, L.L.C.*, 702 F.3d 250, 263 (5th Cir. 2012).

"Section 328(a) . . . creates a 'high hurdle' for a movant seeking to revise the terms governing a professional's compensation ex post facto." *Id.* at 258. This is because "Congress enacted § 328(a) to eliminate the previous uncertainty associated with professional compensation in bankruptcy proceedings, even at the risk of potentially underpaying, or, conversely, providing a windfall to, professionals retained by the estate under § 328(a)." *Id.*

The Appellants argue that "[t]he event that was incapable of anticipation was the strategic decision of the debtors to have ASIT transfer the property [to] the Debtors and use whatever equity existed in the property as adequate protection for the use of cash collateral." (Appellants' Reply at 7, ECF No. 18.) They assert that "it is not conceivable that a debtor would acquire property without court approval." (*Id.* at 9.)

The Bankruptcy Court refused to alter Chaffe's fee award for the following reasons:

> Since it appeared in this case, Yolo Group has been investigating the transfers between and among Debtors and various individual and corporate insiders of Debtors as well as the transaction between EvaBank and ASIT . . . . At a hearing on September 8, 2017, regarding discovery in an adversary proceeding between Debtors and the Yolo Group, counsel for the Yolo Group argued, "We have a ton of interrelated entities. We have a ton of money that's gone out of this business. We have trucks that have been sold out of the trust. We have just something that warrants looking at it very carefully." . . . Additionally, in a term sheet dated December 28, 2017, Yolo conditioned an offer for a DIP loan on a second lien on the Canal Road Property and on a requirement that NTF "file suit against ASIT seeking a declaration that the [Canal Road Property] is in truth and fact owned by [NTF]." . . . Although the post-petition transfer of property outside the ordinary course of Debtors' business and without court approval is extraordinary, the Court cannot find that it was "not capable of being anticipated" given what was suspected or known by the parties from the beginning of the case about the Debtors' dealings with insiders.

(R. Doc. 11-5, at 13-14.)

A de novo review of the record reflects that, from the outset of the bankruptcy proceedings, confusion existed regarding the debtors' liabilities as well as the ownership of the Canal Road Property. As a result, Appellants have not overcome the "high hurdle" of demonstrating that the post-petition acquisition of the Canal Road Property was incapable of being anticipated at the time that Chaffe's engagement proceeding was approved. The Bankruptcy Court's decision is affirmed in this respect.

## III. DIP LOAN

In its cross-appeal, Chaffe asserts that the Bankruptcy Court erred in refusing to include the assumption of the debtor's DIP loan in the calculation of aggregate consideration. The Bankruptcy Court did not include assumption of the

DIP loan in its calculation of "aggregate consideration" because it found that the loan was repaid out of the $3.5 million exit funding cash that had already been included in the "aggregate consideration" calculation.

On February 27, 2018, the Bankruptcy Court granted the debtors permission to obtain post-petition financing from Power Land, LLC or its assignee in an amount not to exceed $1.5 million, because it found that this DIP financing was necessary to rehabilitate the Debtors' business and to facilitate the reorganization of their financial affairs. (R. Doc. 11-6, at 730-37.) Section 5.2 of the Amended Plan of Reorganization confirmed by the Bankruptcy Court on July 2, 2018, provides,

> [T]he Amended Plan Sponsor has committed to paying all amounts due under the DIP Loan on or before June 2, 2018, subject to certain terms and conditions included in the Amended Plan Sponsor Term Sheet. The Reorganized Debtors shall be responsible to repay the amounts paid by the Amended Plan Sponsor on account of the repayment of the DIP Loan in forty-eight (48) monthly payments of principal and interest at the Applicable Rate. The Reorganized Debtors' payment obligation to the Amended Plan Sponsor in connection with repayment of the DIP Loan shall be secured by a second priority lien . . . .

(R. Doc. 11-5, at 40.)

Bruce Lindsay, the president of NTF who was hired as a consultant by the YOLO Group, testified that the DIP promissory note relied on by Chaffe was not an assumption or replacement of the original DIP loan. (R. Doc. 11-7, at 842.) He explained that the original DIP loan to Power Land was paid from the $3.5 million exit cash. (*Id.* at 843.) The Bankruptcy Court relied on Lindsay's testimony in holding that CAC paid the DIP loan using part of the $3.5 million exit cash that the

-9-

Bankruptcy Court had already included in its calculation of "aggregate consideration."

At the hearing before the Bankruptcy Court, Le Breton testified that Chaffe's decision to include repayment of the DIP loan in its calculation of "aggregate consideration" did not constitute double-counting

> [b]ecause in the confirmed amended plan, the CAC [Amended Plan Sponsor] promises in . . . Section 5.2 that they are . . . going to assume the DIP loan, or essentially pay the DIP loan over a 48 month period. This is essentially assuming a debt and, so they don't actually pay the DIP loan out of the three and a half million, but rather, they assume it as a debt.

(R. Doc. 11-7, at 738.) Le Breton then appears to testify that a DIP Promissory Note evidences that the DIP loan was assumed, not paid. (*See id.*) Chaffe also points to this unsigned Promissory Note in its reply brief as evidence that the DIP loan was not paid with cash but was assumed by the Yolo Group. (*See* Chaffe's Reply at 5, ECF No. 19.) When her attorney asked her whether she had "any knowledge about whether any payments have actually been made on this note[,]" she responded, "My understanding actually through you is that I think it's Mr. Draper [counsel for Appellants] told you that they're been no payments yet." (R. Doc. 11-7, at 738.) (all sic in original.) Le Breton further explained her position under cross-examination:

> By Mr. Draper: Did the debtor have sufficient cash, as of the effective date of the plan to either pay off the Power Land DIP loan . . . ?
> By Ms. Le Breton: No.
> Q. That, the only place that money could come from was the three and a half million dollars coming, correct?
> A. Let me try to answer your question exactly. The only place –
> Q. It's a yes or no question.
> A. No. That's not a yes or no question, Doug, because CAC does not pay the DIP loan. That would have been the place that the money

-10-

could have come from had CAC chosen to pay off the loan, but it contributes the value of that as capital and it is now a debt as we can plainly see from the note of the company. They don't choose, they don't do what is on the sources and uses.

Q. They do. Where did the money come from to pay the DIP loan?

A. The DIP loan is not paid. The DIP loan is assumed.

Q. No. In fact, have you checked the court record, and seen that the debtor filed a motion to incur debt with CAC so that it could pay the DIP loan?

A. What I see is the DIP loan amount and then a note for the amount of the DIP loan. This is a, it's a fiction that that loan was paid. It is –

Q. When you say it's a fiction, didn't CAC put up a million, did Power Land not accept a million dollars to make the payment?

A. Yes. Yes, I think they did. But that was done – the loan still exists. It just went from one party to the next.

Q. Okay. Now let's talk about that. The Power Land loan was due as of June 1st, correct?

A. Mm-mm.

Q. And it was due prior to the plan being confirmed.

A. Yes.

Q. Second question. Isn't the CAC payment payable over 48 months? You have the note there.

A. Yes.

Q. Have, you've used the face amount of that note as an amount assumed as consideration to be paid to a creditor.

A. Yes.

Q. You didn't apply a discount rate to that, did you?

A. No, we did not.

Q. And for the unsecured payment, again, the sole source of that was coming from the CAC three and a half million dollars. The debtor didn't have the cash to do that.

A. The sole source –

Q. The debtor couldn't have made the million dollar payment.

A. To?

Q. The unsecured creditors.

A. Yes, that's true, that is – but there was no million dollars in cash paid to the unsecured creditors.

Q. In a sense it is [paid] to them, and then lent back, correct?

A. It is, it is lent, contributed as capital.

Q. No. It doesn't say that. It says it's lent to them. It has a term of repayment in the plan, doesn't it?

A. Yeah. Yeah. It's contributed to them in the form of debt, capital in its broadest sense, debt.

(R. Doc. 11-7, at 769.)

The tangled testimony cited above is best decrypted by viewing Section 5.2 of the Amended Plan of Reorganization, which contains two pertinent requirements. First, the amended plan sponsor and affiliate of the Yolo Group appellants, CAC, agreed to pay all amounts due to Power Land under the DIP Loan on or before June 1, 2018. Second, the reorganized debtors agreed to repay CAC for its payment of the DIP Loan in forty-eight monthly installments. The DIP promissory note referenced by Chaffe and Le Breton actually pertains to the second requirement — the reorganized debtors must repay CAC/the Yolo Group back for the funds paid to Power Land. Le Breton repeatedly asserts that the original DIP loan was never paid but was merely assumed in a second loan. She, on behalf of Chaffe, appears to claim that the DIP promissory note evidences that assumption of the loan.[2] However, the DIP promissory note Le Breton points to is not between CAC/Yolo Group and Power Land, but between Yolo Group and the reorganized debtors. In other words, Chaffe has not pointed to any evidence, or otherwise demonstrated, that Power Land is still owed funds.

As the Bankruptcy Court correctly concluded, the only testimony before the Court concerning the satisfaction of the Power Land DIP loan is Bruce Lindsay's testimony that the loan was paid by CAC out of the $3.5 million exit cash already included in aggregate consideration. If the Bankruptcy Court had awarded Chaffe

---

[2] Nevertheless, if Le Breton and Chaffe are referencing a separate loan, then it is unclear from the briefing and testimony, such that Chaffe has not demonstrated clear error on the part of the Bankruptcy Court.

additional funds based on the repayment of the Power Land DIP loan, that would have constituted a double-counting. At the very least, the evidence, briefing, and testimony presented by Chaffe do not confer a definite and firm conviction that a mistake has been made by the Bankruptcy Court. As a result, the decision of the Bankruptcy Court is affirmed with regard to the proper treatment of the repayment of the DIP loan.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that the rulings of the Bankruptcy Court are **AFFIRMED**, and these two consolidated appeals are **DISMISSED**. The Court will enter a separate judgment pursuant to Fed. R. Civ. P. 58.

**SO ORDERED AND ADJUDGED** this the 16th day of March, 2020.

s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE